UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **AMANDA WHITEHEAD**, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**CLAYTON PROPERTIES GROUP, INC., D/B/A MUNGO HOMES**,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Amanda Whitehead ("Plaintiff") brings this class action against Defendant Clayton Properties Group, Inc. d/b/a Mungo Homes ("Mungo Homes" or "Defendant") for their failure to properly secure and safeguard Plaintiff's and Class Members' Personally Identifiable Information ("PII" or "Private Information") stored within Defendant's information network:

## I. NATURE OF THE ACTION

1. Plaintiff's claims arise from Defendant's failure to properly secure and safeguard Private Information that was entrusted to them and their accompanying responsibility to store and transfer such information.

2. Defendant is the largest builder of manufactured housing in the United States and is a wholly owned subsidiary of Berkshire Hathaway.

3. Defendant acquired, collected, and stored Plaintiff's and Class Members' Private Information.

4. At all relevant times, Defendant knew or should have known, that Plaintiff and Class Members would use Defendant's services to store and/or share sensitive data, including highly confidential Private Information.

5. Private Information generally incorporates information that can be used to distinguish or trace an individual's identity, and is generally defined to include certain identifiers that do not on their face name an individual, but that is considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers, or medical information).

6. Defendant disclosed that, on or around May 6, 2026, an unauthorized third party used social engineering techniques to register a new multifactor authentication (MFA) device and obtain login credentials that permitted the unauthorized third party to download internal files implicating names, social security or individual tax ID numbers, financial account numbers, dates of birth, driver's license, addresses, and medical/prescription or insurance information.

7. Defendant stored Plaintiff's and the Class members' sensitive data on its information network, which was exposed and compromised.

8. Upon information and belief, unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' Private Information as hosted with Defendant, with the intent of engaging in the misuse of the Private Information, including, but not limited to, marketing and selling Plaintiff's and Class Members' Private Information.

9. Defendant disregarded the rights of the Plaintiff and Class Members by failing to implement adequate and reasonable measures to safeguard their Private Information. The Defendant intentionally, willfully, recklessly, or negligently neglected to take available steps to prevent unauthorized data disclosure and failed to follow required protocols, policies, and procedures for encrypting data, even for internal use.

10. As a result, an unauthorized third party accessed and compromised the Private Information of the Plaintiff and Class Members. This malicious party likely intends to profit from

the breach by defrauding the Plaintiff and Class Members in the future.

11. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are thus entitled to injunctive and other equitable relief.

## II. JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are more than 100 putative Class members; and minimal diversity exists because one or more putative Class members are citizens of a different state than Defendant.

13. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business and operations in Tennessee, because Defendant intentionally availed itself of this jurisdiction by regularly conducting business and providing services in Tennessee, and because Mungo Homes's acts and omissions giving rise to Plaintiff's and the Class's claims occurred in and emanated from Tennessee.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Mungo Homes's principal place of business is in Dearborn, Michigan, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## III. PARTIES

15. Plaintiff Whitehead is, and at all times relevant to this Action was, a resident of the state of South Carolina. Plaintiff shared substantial Private Information with Defendant, including her financial information, nonpublic contact information, and other PII in their dealings with Defendant.

16. Upon information and belief, Plaintiff's information was among the data accessed by an unauthorized third party in the Data Breach.

17. At all times herein relevant, Plaintiff was and is a member of the Class.

18. Plaintiff suffered harm through the unlawful and offensive invasion of privacy whereby Defendant allowed third parties to access her Private Information, as well as by losing time dealing with the consequences of the Data Breach. This includes, and continues to include, time spent verifying the breach's legitimacy and impact, exploring credit monitoring and identity theft insurance options, and closely monitoring her accounts for suspicious activity.

19. Defendant's breach also caused Plaintiff harm by exposing her Private Information to a substantial and imminent risk of future harm. Because the breach likely exposed her sensitive data, she faces a high risk of identity theft or fraud.

20. Plaintiff's Private Information may already have been misused as a result of Defendant's breach.

21. Given the nature of the Defendant's clientele, it is also likely that some Class Members' exposed information has already been misused.

22. Plaintiff suffered actual injury through damages to and a decrease in the value of her Private Information, which he entrusted to the Defendant. This intangible property was compromised as a result of the Data Breach.

23. Plaintiff faces imminent harm due to the significantly increased risk of fraud, identity theft, and misuse of her Private Information. With their personal data now in the hands of unauthorized third parties or criminals, he is at a heightened risk of exploitation.

24. Plaintiff has an ongoing interest in ensuring that her Private Information, which she believes is still stored in the Defendant's possession, is protected and safeguarded from future breaches

25. Defendant Mungo Homes is a for-profit corporation organized under the laws of the State of Tennessee. Defendant's principal place of business is located at 5000 Clayton Rd. Maryville, Tennessee 37804-5550.

## IV. FACTUAL ALLEGATIONS

***Defendant's Business and Collection of Private Information***

26. Plaintiff and Class Members are consumers who provided their Private Information in order to purchase merchandise – primarily workwear – from Defendant.

27. As a condition of using their services, Defendant required that Plaintiff and Class Members to provide highly sensitive and confidential Private Information.

28. Defendant acquired, collected, and stored and assured reasonable security over Plaintiff's and Class Members' Private Information.

29. Plaintiff and Class Members provided their Private Information to Defendant, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

30. Plaintiff and Class Members provided their Private Information to Defendant, directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

31. Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on Defendant to

keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

32. Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of its systems. Defendant had and continues to have a legal duty to keep consumer's Private Information safe and confidential.

33. Defendant had obligations created by the Federal Trade Commission Act (the "FTC Act"), contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

34. Defendant derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services they provide.

35. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

***<u>Defendant Had an Obligation to Protect the Stolen Information</u>***

36. Defendant owed a duty to Plaintiff Whitehead and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in Defendant's possession from being compromised, lost, stolen,

accessed, and misused by unauthorized persons.

37. Defendant owed a duty to each Plaintiff Whitehead and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Plaintiff and Class Members.

38. Defendant owed a duty to Plaintiff Whitehead and Class Members to design, maintain, and test its computer systems, servers, and networks to ensure that the Private Information was adequately secured and protected.

39. Defendant owed a duty to Plaintiff Whitehead and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including not sharing information with other entities who maintained sub-standard data security systems.

40. Defendant owed a duty to Plaintiff Whitehead and Class Members to implement processes that would immediately detect a breach in its data security systems in a timely manner.

41. Defendant owed a duty to Plaintiff Whitehead and Class Members to act upon data security warnings and alerts in a timely fashion.

42. Defendant owed a duty to Plaintiff Whitehead and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in the decision to entrust this Private Information to Defendant.

43. Defendant owed a duty of care to Plaintiff Whitehead and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

44. Defendant owed a duty to Plaintiff Whitehead and Class Members to encrypt and/or more reliably encrypt Plaintiff's and Class Members' Private Information and monitor user behavior and activity in order to identify possible threats.

***Value of the Relevant Sensitive Information***

45. Private Information is a valuable commodity for the "cyber black market." Criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites.

46. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[1] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[2] Other sources report that criminals can also purchase access to entire company data breaches from $999 to $4,995.[3]

47. Identity thieves can use Private Information, such as that of Plaintiff and Class Members, which Defendant failed to keep secure, to perpetrate a variety of crimes that harm victims—for instance, identity thieves may commit various types of government fraud such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, using the victim's information to obtain government benefits, or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

---

[1] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed August 17, 2026).

[2] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed August 17, 2026).

[3] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed August 17, 2026).

48. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used: according to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data might be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[4]

49. Here, Defendant knew of the importance of safeguarding Private Information and of the foreseeable consequences that would occur if Plaintiff and Class Members' Private Information were stolen, including the significant costs that would be placed on Plaintiff and Class Members as a result of a breach of this magnitude.

50. As detailed above, Defendant is a sophisticated organization with the resources to deploy robust cybersecurity protocols. It knew, or should have known, that the development and use of such protocols were necessary to fulfill its statutory and common law duties to Plaintiff and Class Members. Therefore, its failure to do so is intentional, willful, reckless and/or grossly negligent.

51. Defendant disregarded the rights of Plaintiff Whitehead and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (ii) failing to disclose that they did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and Class Members' Private

---

[4] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* http://www.gao.gov/new.items/d07737.pdf (last accessed August 17, 2026).

Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

***<u>The Data Breach</u>***

52. On or around August 14, 2026, Defendant notified Massachusetts Attorney General's office of the Data breach and submitted a sample notice letter.[5] The sample notice letter includes the following representation:

> **What Happened.** On or around May 6, 2026, an unauthorized third party used social engineering techniques to register a new multifactor authentication (MFA) device and obtain login credentials, thereby gaining access to a Mungo employee's OneDrive, SharePoint, and email accounts. Upon discovering this activity, Mungo initiated a forensic investigation and determined that between approximately May 6 and May 11, this threat actor downloaded files from these accounts. Further investigation showed that some of the files accessed contained personal information. The specific data elements involved vary by individual and file but may have included one or more of the following data elements: name, social security or individual tax ID numbers, financial account numbers, dates of birth, driver's license, addresses, and medical/prescription or insurance information. On July 1, 2026, the forensic investigation discovered that the aforementioned personal information had been potentially compromised. The investigation found no evidence of any further lateral movement or compromise of any other employee accounts beyond those identified above.

53. Because Defendant failed to properly protect and safeguard Plaintiff's and Class Members' Private Information, an unauthorized third party was able to access Defendant's respective databases and exfiltrate Private Information.

***<u>Data Breaches Are Preventable</u>***

54. Defendant could have prevented this Data Breach by, among other things, properly encrypting Private Information on its network or otherwise ensuring that such Private

[5] COMMONWEALTH OF MASSACHUSETTS OFFICE OF CONSUMER AFFAIRS AND BUSINESS REGULATION, *2026 Data Breach Notification Report*, https://www.mass.gov/doc/data-breach-report-2026/download

Information was protected while in transit or accessible.

55. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

56. The unencrypted Private Information of Class Members will end up for sale to identity thieves on the dark web, if it has not already, or it could simply fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

57. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[6]

58. To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

[6] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited August 17, 2026).

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[7]

[7] *Id.* at 3-4.

59. To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[8]

---

[8] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited August 17, 2026).

60. Given that Defendant was storing the Private Information of its current and former employees and clients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

***<u>Defendant Knew or Should Have Known of the Risk Because Companies In Possession Of Private Information Are Particularly Susceptible To Cyber Attacks</u>***

61. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting companies that collect and store Private Information, like Defendant, preceding the date of the breach.

62. Data thieves regularly target companies like Defendant due to the highly sensitive information that they custody. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

63. According to the Identity Theft Resource Center, the number of data compromises in 2025 (3,322) increased by five percent compared to 2024 (3,152). The number of victim notices was approximately 278,827,933.[9]

64. Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to

---

[9] See Identity Theft Resource Center 2025 Annual Data Breach Report: Record Number of Data Compromises in 2025; 79 Percent Jump Over Five Years (1/29/2026). *available at: https://www.idtheftcenter.org/post/2025-annual-data-breach-report-record-number-compromises/ (last visited September 1, 2026).*

their data quickly."[10]

65. As custodians of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

66. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

67. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

68. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

69. As a company in possession of its current and former employees' and clients' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs

[10] https://www.law360.com/consumerprotection/articles/1220974/ (last accessed August 27, 2026).

imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

***Defendant Failed to Comply with FTC Guidelines***

70. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

71. In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

72. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented

reasonable security measures.

73. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

74. These FTC enforcement actions include actions against companies like Defendant.

75. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

76. Defendant was at all times fully aware of the obligation to protect the Private Information of its employees and clients yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Failed to Comply with Industry Standards***

77. As noted above, experts studying cybersecurity routinely identify companies like Defendant as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

78. Some industry best practices that should be implemented by companies dealing with sensitive Private Information, like Defendant, include but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and

anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all of these industry best practices.

79. Other best cybersecurity practices that are standard include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendant failed to follow these cybersecurity best practices.

80. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

81. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

***<u>The Data Breach Increases Victims' Risk of Identity Theft</u>***

82. Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

83. The unencrypted Private Information of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized

individuals can easily access the Private Information of Plaintiff and Class Members.

84. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

85. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity--or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

86. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

87. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.

88. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on

individuals.[11]

89. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

90. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

91. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

---

[11] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ (last accessed August 17, 2026).

92. Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

93. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss of Time to Mitigate Risk of Identity Theft and Fraud***

94. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their private information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

95. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must remain vigilant and monitor their financial accounts for many years to mitigate the risk of identity theft.

96. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as researching and verifying the legitimacy of the Data Breach.

97. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and

credit record."[12]

98. These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[13]

99. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[14]

***<u>Diminution in Value of Private Information</u>***

100. Private Information is a valuable property right.[15] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt

---

[12] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[13] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited August 17, 2026).

[14] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last accessed August 17, 2026) ("GAO Report").

[15] *See, e.g.,* Randall T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.")(citations omitted).

that Private Information has considerable market value.

101. An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[16]

102. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[17, 18]

103. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[19]

104. Conversely sensitive Private Information can sell for as much as $363 per record on the dark web according to the Infosec Institute.[20]

105. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

106. Based on the foregoing, the information compromised in the Data Breach is

---

[16] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last accessed August 17, 2026).

[17] https://datacoup.com/ (last accessed August 17, 2026).

[18] https://worlddataexchange.com/about (last accessed August 17, 2026).

[19] Nielsen Computer & Mobile Panel, *Frequently Asked Questions, available at* https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last accessed August 17, 2026).

[20] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 7, 2015), https://www.infosecinstitute.com/resources/healthcare-information-security/hackers-selling-healthcare-data-in-the-black-market/ (last accessed August 17, 2026).

significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

107. The fraudulent activity resulting from the Data Breach may not come to light for years.

108. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

109. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

110. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

***Future Cost of Credit and Identity Theft Monitoring is Reasonable and Necessary***

111. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the

Private Information for identity theft crimes –*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

112. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that unemployment benefits were filed for until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

113. Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

114. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

***Loss of the Benefit of the Bargain***

115. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for products and/or services, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received products and/or services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## V. CLASS ALLEGATIONS

116. Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated pursuant to Rules 23(b) and 23(c) of the Federal Rules of Civil Procedure. The "Class" that Plaintiff seeks to represent is defined as follows:

> **Class Definition.** All persons whose Private Information was maintained by Mungo Homes and was compromised in the Data Breach.

117. Excluded from the Class are Defendant and Defendant's subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

118. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

119. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, there are many thousands of individuals whose Private Information was improperly accessed in the Data Breach, and each Class member is identifiable within Defendant's records.

120. **Commonality.** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

a. Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class members' Private Information;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendant owed a duty to Plaintiff and Class members to safeguard their Private Information;

f. Whether Defendant breached its duties to Plaintiff and Class members to safeguard their Private Information;

g. Whether computer hackers / cybercriminals obtained Plaintiff's and Class members' Private Information in the Data Breach;

h. Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Plaintiff and Class members suffered legally cognizable damages as a result of Defendant's misconduct;

j. Whether Defendant's acts, inactions, and practices complained of herein amount to a breach of contract, and/or common law negligence, and whether Defendant has been unjustly enriched;

k. Whether Defendant failed to provide notice of the Data Breach in a timely and proper manner; and

l. Whether Plaintiff and Class members are entitled to compensatory damages, exemplary damages, punitive damages, civil penalties, equitable relief, and/or injunctive relief.

121. **Typicality.** Plaintiff's claims are typical of those of other Class members because Plaintiff's Private Information, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiff, like all Class members, was injured by Defendant's uniform conduct. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of other Class members arise from the same operative facts and are based on the same legal theories.

122. **Adequacy of Representation.** Plaintiff will fairly and adequately represent and protect the interests of the Class, and he has no disabling or disqualifying conflicts of interest that would be antagonistic to those of the other members of the Class. The damages and infringement of rights that Plaintiff suffered are typical of the other Class members, and Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class. Plaintiff has a genuine personal interest, not a mere technical interest, in the outcome of this Action. Plaintiff has retained counsel experienced in complex class action litigation, including, but not limited to, data privacy class action litigation, and Plaintiff intends to prosecute this Action vigorously. Therefore, Plaintiff can and will fairly and adequately protect and represent the interests of the Class.

123. **Superiority of Class Action.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based upon an identical set of facts. Without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

124. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action. This proposed class action does not present any unique management difficulties.

125. Adequate notice can be given to Class members directly using information maintained in Defendant's records.

126. **Predominance.** The issues in this action are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Defendant has engaged in a common course of conduct toward Plaintiff and Class members. The common issues arising from Defendant's conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these issues in a single action has important and desirable advantages of judicial economy.

## COUNT I
## GROSS NEGLIGENCE

127. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

128. Defendant knowingly collected, acquired, stored, and/or maintained Plaintiff's and Class members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing, and protecting the Private Information from being disclosed, compromised, lost, stolen, or misused by unauthorized parties.

129. This duty included obligations to take reasonable steps to prevent disclosure of the Private Information, and to safeguard the information from theft. Defendant's duties included the

responsibility to design, implement, and monitor its data security systems, policies, and processes to protect against reasonably foreseeable data breaches such as this Data Breach.

130. Defendant owed a duty of care to Plaintiff and Class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, its policies and procedures, and the personnel responsible for them adequately protected the Private Information.

131. Defendant owed a duty of care to safeguard the Private Information due to the foreseeable risk of data breaches and the severe consequences that would result from its failure to safeguard Private Information.

132. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and those individuals who entrusted Defendant with their Private Information, which duty is recognized by laws and regulations, including but not limited to the FTC Act and common law.

133. In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the FTC Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

134. Defendant's duty to use reasonable care in protecting Private Information arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect Private Information that it acquires, maintains, or stores.

135. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class members could and would suffer if their Private Information were wrongfully disclosed.

136. Defendant had a special relationship with Plaintiff and Class members. Plaintiff's and Class members' willingness to entrust Defendant with their Private Information was predicated on the understanding that Defendant would take adequate security precautions to protect that Private Information.

137. By assuming the responsibility to collect and store this data, Defendant had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

138. Defendant breached its duties, and was grossly negligent, by failing to use reasonable measures to protect Plaintiff's and Class members' Private Information, as alleged and discussed above.

139. The Data Breach was caused by the willful and wanton misconduct or gross negligence of Defendant.

140. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties and by failing to implement and maintain rudimentary data security safeguards, like multifactor authentication and/or encryption, to keep the Private Information protected when stored, used, and transmitted.

141. It was foreseeable that Defendant's failure to use reasonable measures to protect Class members' Private Information would result in injury to Plaintiff and Class members.

Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in industries such as Defendant's.

142. It was therefore foreseeable that the failure to adequately safeguard Class members' Private Information would result in one or more types of injuries to Class members.

143. The imposition of a duty of care on Defendant to safeguard the Private Information it maintained, transferred, stored, or otherwise used is appropriate because any social utility of Defendant's conduct is outweighed by the injuries suffered by Plaintiff and Class members as a result of the Data Breach.

144. As a direct and proximate result of Defendant's gross negligence, Plaintiff and Class members are at a current and ongoing imminent risk of identity theft, and Plaintiff and Class members sustained compensatory damages, including the following: (i) invasion of privacy; (ii) financial out-of-pocket costs incurred mitigating the material risk and imminent threat of identity theft; (iii) loss of time and loss of productivity incurred mitigating the material risk and imminent threat of identity theft; (iv) financial out-of-pocket costs incurred due to actual identity theft; (v) loss of time incurred due to actual identity theft; (vi) loss of time due to increased spam and targeted marketing emails; (vii) diminution of value of their Private Information; (viii) future costs of identity theft monitoring and/or credit monitoring; (ix) anxiety, annoyance, and nuisance; and (x) the continued risk to Private Information, which remains in Defendant's and the threat actors' respective control, and which is subject to further breaches, including for so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' Private Information.

145. Plaintiff and Class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

146. Defendant's grossly negligent conduct is ongoing, in that Defendant still holds the Private Information of Plaintiff and Class members in an unsafe and insecure manner.

147. Plaintiff and Class members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**

148. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

149. Plaintiff and Class members entrusted Defendant with their Private Information.

150. Defendant had an implied contract with Plaintiff and Class members that it would protect the Private Information collected from them.

151. Defendant knew or should have known that it must protect Plaintiff's and Class members' confidential Private Information in accordance with Defendant's stated policies, industry best practices, and the applicable law.

152. As consideration, Plaintiff and Class members turned over valuable Private Information to Defendant as part of their transactions, business relationships, and contractual dealings with ABC Supply.

153. Defendant accepted possession of Plaintiff's and Class members' Private Information for the purpose of entering into contractual business relationships with Plaintiff and Class members. In delivering their Private Information to Defendant, Plaintiff and Class members intended and understood that Defendant would adequately safeguard the Private Information.

154. Defendant's implied promises to Plaintiff and Class members include, but are not limited to the following: (1) taking steps to ensure that anyone who is granted access to Private Information also protects the confidentiality of that data; (2) taking steps to ensure that the Private Information placed in control of Defendant's employees is restricted and limited only to achieve authorized business purposes; (3) restricting Private Information access only to employees and/or agents who are qualified and trained; (4) designing and implementing appropriate retention policies to protect Private Information; (5) applying or requiring proper encryption and/or the separation of different data sets containing Private Information; (6) implementing multifactor authentication for access to Private Information; and (7) taking other steps to protect against foreseeable breaches.

155. Plaintiff and Class members would not have entrusted their Private Information to Defendant in the absence of such an implied contract.

156. Defendant violated this implied contract and these implied promises by failing to employ reasonable and adequate security measures to secure Plaintiff's and Class members' Private Information.

157. Plaintiff and Class members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein. Plaintiff seek damages, including restitution, actual damages, nominal damages, and any other awardable form of damages, in an amount to be proven at trial.

## COUNT III
## UNJUST ENRICHMENT

158. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

159. This count is asserted in the alternative to breach of implied contract (Count II).

160. Plaintiff and Class members conferred a benefit on Defendant, whereby their Private Information was provided to Defendant in connection with Defendant's dealings with Plaintiff and Class members.

161. Defendant, prior to and at the time Plaintiff and Class members entrusted it with Private Information, caused Plaintiff and Class members to reasonably believe that it would keep that Private Information secure.

162. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures in order to secure Plaintiff's and Class members' Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

163. Under the principles of equity and good conscience, Defendant should not be permitted to retain the value of the Private Information belonging to Plaintiff and Class members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

164. Defendant failed to secure Plaintiff's and Class members' Private Information and, therefore, did not provide full compensation to Plaintiff and Class members for the benefit Plaintiff and Class members provided.

165. Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

166. Defendant failed to disclose facts pertaining to its substandard information systems, or defects and vulnerabilities therein, before Plaintiff and Class members made their decisions to provide Defendant with their Private Information.

167. Plaintiff and Class members have no adequate remedy at law.

168. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will suffer injury, including but not limited to the following: (a) actual identity theft; (b) the loss of the opportunity to control how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures, including for so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class members.

169. As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm.

170. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that Defendant unjustly received

from them. In the alternative, Defendant should be compelled to refund to Plaintiff and Class members the proceeds it received because of Defendant's misconduct related to the Data Breach.

**COUNT IV**
**DECLARATORY JUDGMENT**

171. Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

172. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights, statuses, and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of federal and state law as described in this Complaint.

173. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiff's and Class members' Private Information and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their Private Information. Plaintiff alleges that Defendant's data security measures remain inadequate. Furthermore, Plaintiff continues to suffer injury as a result of the compromise of her Private Information and remains at imminent risk that further compromises of her Private Information will occur in the future.

174. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owes a legal duty to secure Private Information and to timely notify impacted individuals of a data breach under the common law and state statutes; and

b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Private Information in its possession.

175. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Private Information in its possession.

176. If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and he will be forced to bring multiple lawsuits to rectify the same conduct.

177. The hardship to Plaintiff if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiff will likely be subjected to substantial identity theft and other damages. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable protective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

178. Issuance of the requested injunction is in the public interest. Such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class members whose confidential information would be further compromised.

## V. PRAYER FOR RELIEF

179. WHEREFORE, Plaintiff, on her own behalf and on behalf of all others similarly situated, prays for relief as follows:

A. For an Order certifying this case as a class action and appointing Plaintiff and her counsel to represent the Class;

B. For an award of actual damages, exemplary damages, punitive damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

C. For injunctive and other equitable relief to ensure the protection of the sensitive information of Plaintiff and the Class which remains in Defendant's possession;

D. For declaratory relief;

E. For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

F. Pre- and post-judgment interest on any amounts awarded; and

G. Such other and further relief as the Court may deem just and proper.

## VII. JURY TRIAL DEMAND

180. Plaintiff hereby demands a trial by jury on all claims so triable.

DATED: September 26, 2026

Respectfully submitted,

*<u>/s/ Grayson Wells</u>*
Grayson Wells (TN BPR # 039658)
J. Gerard Stranch, IV (TN BPR # 23045)
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa Parks L. Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gwells@stranchlaw.com
gstranch@stranchlaw.com

Shpetim Ademi (WI SBN 1026973) *
Guri Ademi (WI SBN 1021729) *
John D. Blythin (WI SBN 1046105) *
**ADEMI LLP**
3620 E. Layton Ave.
Cudahy, WI 53110
Tel: (414) 482-8000
sademi@ademilaw.com
gademi@ademilaw.com

jblythin@ademilaw.com

***Pro hac vice*** **forthcoming***

***Attorneys for Plaintiff and the Proposed Class***